UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:

AT LAW AND IN ADMIRALTY

NORMA SIMPSON,

      Plaintiff,

v.

CARNIVAL CORPORATION
d/b/a CARNIVAL CRUISE LINE,

      Defendant.

_____/

## COMPLAINT FOR DAMAGES

The Plaintiff, NORMA SIMPSON, hereby sues the Defendant, CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE, and files this Complaint, and alleges:

## THE PARTIES AND JURISDICTION

1.    This is an action seeking damages in excess of $75,000.00, exclusive of interest, costs and attorney's fees.

2.    **THE PLAINTIFF**. The Plaintiff, NORMA SIMPSON, is a permanent resident and citizen of Vermilion, Ohio.

3.    **THE DEFENDANT**. The Defendant, CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE (hereinafter referred to as CARNIVAL or Defendant or the cruise line), has its principal place of business in Miami, Florida. CARNIVAL is foreign corporation, a citizen of the foreign nation of Panama, but does business in the State of Florida, and at all times material hereto

1

was and is doing business in Miami-Dade County, Florida.  At all times material hereto, the Defendant CARNIVAL owned and/or operated the subject cruise ship and organized and operated the cruise voyage on which the Plaintiff suffered injury.  At all times material hereto, the Defendant promoted and/or controlled the private island of Half Moon Cay as a Carnival-destination experience and as part and parcel of the Carnival cruise experience.

4.     **FEDERAL SUBJECT MATTER JURISDICTION**. Federal subject matter jurisdiction arises under and is by virtue of Diversity of Citizenship pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States and/or citizens of a State and citizens or subjects of a foreign state, and arises under and is by virtue of the admiralty or maritime jurisdiction pursuant to 28 U.S.C.§ 1333, and is being filed in Federal Court as required by the venue selection clause in the Passenger Contract Ticket issued by the Defendant.

5.     **VENUE AND PERSONAL JURISDICTION**. The Defendant, at all times material hereto, personally or through an agent, in the County and in the District in which this Complaint is filed:

a.     Operated, conducted, engaged in or carried on a business venture in this state and/or county; and/or

b.     Had an office or agency in this state and/or county; and/or

c.     Engaged in substantial activity within this state; and/or

d.     Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193;

6.     All conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

2

7.     **CARNIVAL'S OWNERSHIP CONTROL, PARTNERSHIP AND/OR AGENCY REGARDING HALF MOON CAY**: This action for negligence arose from a visit to an island, Half Moon Cay, used and/or controlled by CARNIVAL and owned and/or leased by HAL Properties Limited. HAL Properties Limited is a subsidiary wholly owned by another wholly-owned Carnival Corporation subsidiary including but not limited to Holland America Line N.V. d/b/a Holland America Line N.V. LLC; HAL antillen N.V.; Holland America Line Inc.; and/or Holland America Line-USA, Inc. d/b/a Holland America Lines. HAL Properties Limited and the corporations which own or control HAL Properties Limited shall hereinafter collectively be referred to as ("HAL").  At all times material hereto, Carnival Corporation owned and/or controlled HAL Properties, Ltd., by virtue of its corporate structure because Carnival Corporation is the parent corporation which wholly owns HAL Antillen N.V. which wholly owns HAL Properties Ltd.

8.     **JOINT VENTURE – INTENT TO ENTER A JOINT VENTURE:** CARNIVAL and HAL also manage and operate the island known as "Half Moon Cay" as a joint venturers.  The intent to enter this venture between Carnival and HAL is illustrated in several ways.

9.     Intent underlying the joint venture between HAL and Carnival is shown through the sharing of responsibilities. For instance, Carnival and HAL Properties Ltd. communicate by email to relay what role each party expects the other to play.  Carnival runs the food, drink and souvenirs while HAL Properties Ltd. oversees the snorkels, fins, tours and activities.  In order to bring necessary commodities to the island, HAL and Carnival agreed that Carnival would transport items such as building materials to Half Moon Cay without charging HAL.   At all times material hereto, Carnival has carried out this work transporting necessaries to and from Half Moon Cay without any charge to HAL.

10.     Carnival and HAL are financially entangled in other ways as well. Each entity bears the risk and enjoys the pecuniary benefits of their joint labor at Half Moon Cay. Carnival pays island staff 1.25% of all shore excursion tours on the island while HAL Properties Ltd. pays an additional 1.25% commission. Carnival and HAL Properties Ltd. share the revenue from sales of retail, rentals and shore excursions by a percentage at Half Moon Cay.

11.     To keep the private island operational, Carnival transports hundreds of its own crewmembers on an ongoing basis for years prior to and up through the incident involving Plaintiff Simpson to operate Half Moon Cay in conjunction with HAL. Without Carnival's crewmembers, Half Moon Cay could not function.  Carnival security officers police the island. Carnival medics treat and render aid to the injured.  Half Moon Cay would run out of food and drink for Carnival guests if not for Carnival's efforts to stock the island. The food and drinks served on Half Moon Cay are prepared to Carnival's specific standards.  Carnival supplies the souvenirs that are sold to passengers as a way to memorialize their visit to Half Moon Cay.

12.     **JOINT VENTURE – COMMON PURPOSE:** Carnival and HAL Properties Ltd. entered into an agreement and collaborated over the last several years in an effort to provide Carnival's passengers with a shore excursion – in this case a visit to Half Moon Cay. Before the coronavirus pandemic, Carnival brought its passengers, like Norma Simpson, to Half Moon Cay multiple times a week, hundreds of times each year. Carnival transports its crewmembers, drinks, food, and souvenirs for the purpose of profiting from passengers during their visit to Half Moon Cay. HAL does not object to this conduct from Carnival because HAL also shares in the profits with Carnival that come from Carnival cruise passenger visits to Half Moon Cay. For instance, Carnival sells onshore excursions to Half Moon Cay aboard its ships and then shares a percentage of the excursion revenue with HAL Properties Ltd.  HAL Properties Ltd. maintains an island

4

manager and operates various shore excursions including snorkeling, nature walks, kayaking, island eco tours, horseback riding, stingray adventures, bike tours as well as other activities. Although each entity carries out its own duties under the arrangement, there is a community of interest in the performance of a common purpose – to profit from the operation of Half Moon Cay for Carnival's passengers.  And this island is not open to passengers from other cruise lines outside of Carnival Corporation cruise brands. Thus, HAL cannot and does not contract with other cruise brands and does not provide services to other tourists associated with different cruise companies or tourists coming in through other means like private boat or airplane.  HAL's existence is solely to function as a partner with Carnival Corporation brand cruise lines to profit with Carnival on the services and products which are offered at Half Moon Cay.  The purpose of this arrangement between Carnival and HAL focuses exclusively on generating shared profits from providing visits and services to Carnival-brand cruise passengers.

13.  **JOINT VENTURE – CONTROL/RIGHT OF CONTROL:** Carnival manages the operations of Half Moon Cay by bringing to the island over 300 crewmembers to man the island and island operations; by bringing medics to the island to provide medical care; by bringing security staff to secure the island; by transporting souvenirs to the island to be sold; by bringing staff to serve food and drink; bringing passengers to the island by offering excursions; by maintaining a Carnival information booth ashore; by sending photographers to the island to photograph passengers; by demanding repairs by contacting the island manager, such as Anthony Black and/or others; and by maintaining the ultimate authority to take Carnival business elsewhere should Carnival's demands not be met.

14.  Carnival operates Half Moon Cay jointly with HAL Properties Ltd., a subsidiary of Holland America Antillen N.V. which is a wholly owned subsidiary of Carnival Corporation, the

5

Defendant. Carnival Corporation and Carnival Plc have 100% ownership of the entity which Carnival owns and markets as a Carnival private island.

15. Carnival constantly uses Half Moon Cay in its operations as a planned port of call for its cruises for at least 10 years, at least 140 times per year, 8 to 12 times per month, and two to three times per week.

16. Carnival's arrival at Half Moon Cay is a coordinated effort between Carnival and HAL Properties Ltd. While at Half Moon Cay, Carnival's passengers are the only guests on the island. Carnival provides guests to the island by transporting its passengers who wish to go ashore. Carnival is not required to use Half Moon Cay as a port of call, but elects to do so which gives Carnival the ultimate control over the profits, quality control, and rights over Half Moon Cay. Carnival transports commodities such as building materials and whatever else owned by HAL Properties aboard its ships on behalf of HAL Properties Limited for free. Carnival transports HAL Properties Ltd.'s property at no expense because the property is transferred to its sister brand. HAL Properties Ltd. allows Carnival to inspect, copy and audit the books they keep for excursion information.

17. Carnival controls the operations of Half Moon Cay by staffing the island. Carnival's crewmembers man Half Moon Cay while Carnival passengers are ashore. Carnival sends as many as 320 crewmembers from its ships to go ashore to work on Half Moon Cay. The Carnival crewmembers go ashore to sell drinks, merchandise, work excursions and provide food for Carnival's passengers. The Carnival crewmembers are transported to Half Moon Cay by the same or similar tender boats as Carnival passengers take to arrive at the island.

18. Carnival controls the operations of the island by directing its passengers to use their onboard "Sail and Sign" card and account to make purchases on the island. Carnival's "Sail and

6

Sign" card is essentially a credit card and is the only method of payment available to passengers while being a guest with Carnival. When passengers use their Carnival Sail and Sign cards, the purchase is charged directly to the passenger's account aboard the ship. HAL knows of this payment arrangement whereby Carnival passengers can charge purchases to their shipboard accounts and consents to Carnival's arrangement for charging for purchases and/or other goods while Carnival passengers visit the island.

19.     Carnival controls the operations of the island by stocking merchandise, food, and beverages at Half Moon Cay. Carnival transfers products and various commodities from their cruise ships to Half Moon Cay using a Carnival clipper boat and/or other similar vessel. Carnival transports merchandise including food, bar, and retail items to Carnival in addition to transporting commodities on behalf of HAL Properties Ltd. to Half Moon Cay. This ability is unique to Half Moon Cay.  Carnival would be prohibited from bringing food and beverage to cook, let alone sell to passengers at other ports, for example, Key West, Florida.

20.     Carnival controls the operations of the island by managing the food operations. Carnival cooks and prepares the food listed on the menus advertised at Half Moon Cay. Carnival maintains control over the food and menus at Half Moon Cay to guarantee Carnival standards in food preparation by selecting, bringing, as well as actually preparing the food themselves. Carnival tasks its hotel department to create the menus at Half Moon Cay. The food Carnival's staff transports and prepares on Half Moon Cay, is part of Carnival passengers' ticket, and they therefore do not pay additional fees for the food served on Half Moon Cay. Half Moon Cay does not have any private restaurants, i.e. restaurants not managed and provisioned by Carnival, available for Carnival passengers.  At all times material hereto, HAL knew about, consented, and/or cooperated with Carnival on this arrangement for food and beverage services on the island.

21.     Carnival controls the operations of the island by managing the drink sales and operations on Half Moon Cay. Carnival supplies beverages, which are blended to Carnival's specifications and then sold to its passengers. The blended beverages are prepared by the bar staff who prepare the same drink onboard Carnival ships according to Carnival's standards. Carnival sends bartenders and servers to Half Moon Cay to sell drinks to Carnival passengers on the island. Carnival knows that if they do not serve and provide food and beverages to its passengers on Half Moon Cay there would be no reason for passengers to go ashore. If Carnival did not have the control over the food and beverage that they possess at Half Moon Cay with HAL Properties Ltd., they would not go to Half Moon Cay. Carnival would rather substitute Half Moon Cay with another destination and replenish the lost revenue from Half Moon Cay somewhere else.

22.     Carnival controls the operations of the island by managing security on Half Moon Cay. Carnival sends security officers to work ashore and communicate and operate with island managers, such as Anthony Black, who is not a Carnival employee.  At all times material, HAL knows about, consents, and/or cooperates in the arrangement where Carnival security crewmembers are present to police activities on Half Moon Cay.

23.     Carnival controls the operations of the island by providing personnel for all positions which Carnival needs for the sale of merchandise and food to passengers on Half Moon Cay.  Carnival also staffs Half Moon Cay's first-aid station for medical assistance. The first-aid station nurses wear Carnival nametags and blue medical scrubs. Additionally, Carnival sends crewmembers such as staff cooks, bartenders, hotel stewards, chefs de cuisine, pantry-garde managers, bar waiters, accountants, gift shop salespeople, photographers, team waiters, demi chef de partie, team head waiters, and team waiters to work on Half Moon Cay.

24.     Carnival controls the operations of the island by providing housekeeping services. Carnival's own housekeeping staff goes ashore to maintain Oasis Rentals on Half Moon Cay. Carnival Housekeeping orders bar managers and room service to go ashore by certain times to prepare and stock cabanas for its passengers.

25.     **JOINT VENTURE – JOINT PROPRIETARY INTEREST:** Carnival and HAL share significant interests in the ultimate subject matter of their contract: providing Carnival's passengers with a vacation destination experience. Carnival and HAL share resources to accomplish most of the essential elements of their business venture. Carnival and HAL work in concert to profit from Carnival's passengers brought to Half Moon Cay. Carnival and HAL both rely on the island manager to oversee the island when passengers are off the island.  Carnival and HAL both rely on Carnival to transport and produce supplies to the island for both entities to use to operate and maintain the island.  Because the private island Half Moon Cay represents such a business opportunity for Carnival, an opportunity to profit from sales of goods and services to Carnival passengers, Carnival willingly transports goods and personnel to the island without charge to HAL so that Carnival and HAL can work together to provide a Carnival experience and continue to profit therefrom.

26.     **JOINT VENTURE – SYSTEM OF SHARING PROFITS AND LOSSES:** Carnival receives a financial benefit each time it utilizes Half Moon Cay as a planned port of call. Carnival derives revenue from passenger expenditures when passengers are ashore at Half Moon Cay.  Carnival shares its revenue derived from Carnival passenger expenditures at Half Moon Cay with its wholly owned subsidiaries HAL Antillen N.V. and HAL Properties Ltd. This revenue sharing percentage between Carnival, HAL Antillen N.V. and HAL Properties Ltd. is determined

before each Carnival ship utilizes Half Moon Cay as a planned port of call.  Each entity receives a fixed percentage of the revenue derived from Carnival passenger expenditures at Half Moon Cay.

27.     The amount of revenue sharing between Carnival, HAL Antillen N.V. and HAL Properties Ltd. is completely dependent upon the amount of revenue generated from Carnival passenger expenditures at Half Moon Cay. Therefore, if Carnival passenger expenditures do not generate a profit, all three entities suffer a loss. HAL Properties Ltd. and HAL Antillen N.V. derive revenue from Carnival's use of Half Moon Cay. HAL Antillen N.V. and HAL Properties Ltd. receive a benefit each time Carnival utilizes Half Moon Cay as a planned port of call.  Carnival sales are volume driven and thus the more sales the more money Carnival makes.

28.     Revenue shared between Carnival and HAL Properties Ltd. for excursions is based on an agreement and understanding between the parties. Both entities share a percentage from a set pricing structure. Carnival also pays island staff 1.25% of all shore excursion tours on the island and HAL Properties Ltd. pays an additional 1.25% commission. Carnival agrees with HAL Properties Ltd. to both advertise and sell shore excursions to its passengers.

29.     Carnival and HAL Properties Ltd. share revenue made from sales of commodities (retail) brought to Half Moon Cay by Carnival with 80% going to HAL Properties Ltd. and 20% to Carnival. Based on an unexecuted written agreement between HAL Properties Limited and Carnival, Carnival receives 20% and HAL Properties Ltd. gets 80% of gross sales of rentals and shore excursions at Half Moon Cay.  Carnival's ability to physically bring their own merchandise to sell on Half Moon Cay is unique, and does not occur when Carnival brings passengers to locations, such as Key West, Florida.  Each entity will suffer its proportionate share of the losses when participation declines.  This is because Carnival uses Half Moon Cay as a private island.  If a Carnival Cruise Line ship or another Carnival Corporation brand ship cannot make it to port,

HAL properties will lose revenue and profit.  That is because HAL has no other source of guests outside of Carnival Corporation.  There are no other visitors allowed on the island besides Carnival Corporation passengers sailing to the island with a Carnival Corporation brand.

30.     **APPARENT AGENCY/AGENCY BY ESTOPPEL:** At all times material hereto, Carnival was the apparent principal of HAL who was the apparent agent of Carnival. Carnival through its actions and conduct represents to its passengers including, but not limited to the Plaintiff herein, that HAL Properties Ltd. worked for the benefit of Carnival—in other words, that Half Moon Cay was Carnival's private island.  Carnival advertised and sold shore excursions and rentals operated by HAL Properties Ltd.  Carnival staffed the private island with its own crewmembers who wore Carnival uniforms and nametags.  Carnival crewmembers with Carnival name tags rode on the same tender boats as passengers when being transported to the island. Carnival bombarded Plaintiff and its other cruise passengers with these manifestations of control over this island and HAL Properties, Ltd, at and/or before the purchase of the cruise and at all times thereafter that Half Moon Cay was Carnival's private island.  Plaintiff Norma Simpson chose this particular cruise because of the itinerary of this voyage which Carnival represented as involving a visit to Carnival's private island Half Moon Cay. Plaintiff Norma Simpson saw Carnival's representation, and reasonably relied on Carnival's statements and manifestation of its ownership and control of Half Moon Cay and everything on Half Moon Cay including HAL itself. At all times material hereto, Carnival did not identify HAL Properties Ltd. to Plaintiff Simpson or any other Carnival passengers as the owner/operator of Half Moon Cay.  Further manifesting Carnival's control of Half Moon Cay and HAL, Carnival required shore side activities, rentals, and food and drink to be purchased by passengers using their Carnival cruise line accounts. The activities and rentals offered at Half Moon Cay were advertised to passengers aboard Carnival's

ship and sold at a desk located on the Carnival vessel manned by Carnival employees.  As a result of these representations and manifestations of control over Half Moon Cay and HAL, the Plaintiff had a reasonable belief that HAL Properties Ltd. was Carnival and/or was acting as Carnival's agent.

31.     **ACTUAL AGENCY:**  This is an action based on the agency relationship between Carnival and HAL Properties Ltd. in which HAL Properties Ltd. acted and acts as the actual agent of Carnival in the maintenance, operation, and safety of the operation of Half Moon Cay which is used by Carnival's passengers on a frequent and ongoing basis.

32.     Carnival acted as HAL Properties Ltd.'s principal. Carnival acknowledged that HAL Properties Ltd. would act on its behalf and provide shore excursions, inspect and manage Half Moon Cay on behalf of Carnival for the benefit of Carnival's passengers. Carnival's acknowledgment of HAL Properties Ltd. as its agent is evidence by the fact that HAL Properties Ltd. consented, accepted the relationship, and provided shore excursions, and inspected and managed Half Moon Cay for Carnival and its passengers. Carnival maintained and exercised control over the activities of HAL Properties Ltd. The control was evidenced by the fact that Carnival had an ongoing business relationship with HAL Properties Ltd.  Control included HAL's complete dependence on Carnival for regularly bringing cruise passengers to the island.  Without such Carnival cruise passengers no other tourists in any significant numbers would visit the island.

33.     The actual agency is evidenced both verbally and through actions and conduct.  The ongoing business relationship between Carnival and HAL Properties Ltd. is significant and has existed for at least the last five years.  The nature of their relationship is such that Carnival regularly makes demands upon HAL Properties Ltd. to accommodate its passengers.  Carnival and HAL Properties Ltd regularly exchange communications in the regular course of business, specifically

via email, where the entities act like employer and employee and Carnival does not object.  This relationship includes regular communication and cooperation.  Carnival maintained control over HAL Properties Ltd. in profits, quality control, and rights over Half Moon Cay. Carnival transports commodities such as building materials and other supplies for HAL Properties free of charge.  Carnival transports HAL Properties Ltd.'s property at no expense because the property is transferred to its sister brand.  HAL Properties Ltd. allows Carnival to inspect, copy and audit the books they keep for excursion information.

## OTHER ALLEGATIONS COMMON TO ALL COUNTS

34.    **DATE OF INCIDENT.**  This incident occurred on January 8, 2020.

35.    **LOCATION OF INCIDENT AND OPERATIVE FACTS.**  The Plaintiff was a passenger of the vessel Carnival *Victory*, a ship in navigable water, when Carnival invited the Plaintiff to visit the island known as Half Moon Cay.  Because Carnival cannot dock its cruise vessels on the island, Carnival uses tender boats to shuttle passengers to the island.  This was Plaintiff Norma Simpson's first cruise and her first visit to Half Moon Cay.  Thus, Plaintiff Simpson and her travel companions did not know that other more experienced cruisers would rush off of the tender boat to try to reserve amenities like beach chairs before all such amenities were gone. Carnival did know or have reason to know that other cruise passengers would act in this way due to Carnival's regular and on-going visits to the island for years prior to January 8, 2020.

36.    This incident occurred as Carnival disembarked passengers off of the tender boat onto Half Moon Cay which brought Plaintiff and other cruise passengers to the island.  In the walkway exiting the tender boat area, Carnival allowed a foot wash to exist in the foreseeable walking path of cruise passengers.   The foot wash featured raised barriers which protruded into the walkway exiting the tender boat.  Plaintiff, who was making her first visit to the island, did not know that this foot

13

wash was present in the walkway.   Carnival did know or at least should have known about the foot wash barriers which protruded into the walkway because Carnival regularly visited the island.  And Carnival's crewmembers regularly traveled back and forth past the foot wash barrier when the crewmembers went ashore to work on Half Moon Cay for years prior to the subject incident.

37.     Upon arriving at Half Moon Cay at about 10 am on the morning of January 8, 2020, Plaintiff and her husband exited the tender boat.  Other cruise passengers rushed to get around, Plaintiff and her husband.  Suddenly and unexpectedly, Plaintiff Norma Simpson tripped and fell after her foot/leg caught one of the raised barriers of the foot wash.  Plaintiff Simpson fell onto her head/face and then her right-side resulting injury, including but not limited to a right proximal humerus fracture. Plaintiff Simpson has also suffered from blurry vision and difficulty focusing on objects with her eyes as a result of the impact she took to her head and face.  Plaintiff Simpson experiences headaches and memory problems from her head trauma as well.

38.     Because the incident just described occurred on Carnival's private island, which was part and parcel of the cruise voyage experience, the Plaintiff's claims are governed by the general maritime law. Specifically, the incident occurred on the cruise port and/or property in Little San Salvador Island, also known as Half Moon Cay, which is owned, controlled, and utilized by or on behalf of Carnival.

39.     **<u>STATUS OF PLAINTIFF AS OF DATE AND TIME OF INCIDENT.</u>** At all times material hereto, the Plaintiff was a Carnival cruise passenger sailing on the Carnival *Victory* and on the Carnival cruise excursion to Half Moon Cay, an island controlled and utilized by the Defendant.  Accordingly, the Plaintiff was an invitee of Carnival while on the *Victory* and while on Half Moon Cay.

40.    **THE CRUISE**. Carnival Corporation d/b/a Carnival Cruise Line is in the business of providing vacation experiences to cruise passengers. The vacation experience includes events which take place on the ship and off the ship. The ports at which the Carnival cruise ships land are also part of the cruise/vacation experience. Carnival chose Little San Salvador Island also known as Half Moon Cay to be part of the voyage itinerary for Carnival *Victory* in January of 2020. Carnival had selected Half Moon Cay as a port of call for hundreds of cruises prior to the Plaintiff's voyage in January 2020.  At all times material hereto, Carnival either owns Half Moon Cay, owns or controls the entities which own the island, controls this island and the operation and maintenance of the cruise passenger facilities on the island including the subject staircase and surrounding structures and land, and/or utilizes this island and its cruise passenger facilities including but not limited to the area where tender boats disembark passengers onto the subject island.

41.    **CARNIVAL REGULARLY DIRECTS ITS PASSENGERS TO THESE FACILITIES**.  Carnival continuously chooses to use Half Moon Cay to provide its passengers with access to the entire island and its beaches as part of the Carnival cruise experience. In order to encourage passengers to go ashore, Carnival aggressively market's Half Moon Cay as Carnival's "private island" experience. Then, Carnival arranges and provides for transportation of its passengers to the cruise passenger facilities on Half Moon Cay via tender boats.

42.    Carnival sends its own shipboard employees to Half Moon Cay to man the shops, excursions, bars, and other facilities on Half Moon Cay when its passengers utilize Half Moon Cay.

43.    Carnival shares a percentage of the gross revenues derived from the Carnival passengers which Carnival takes to the island with HAL Properties Limited, a corporation owned by Carnival's wholly owned subsidiary HAL Antillen, N.V.

44.     Because of the fact that this port and the activities thereon are part and parcel of the cruise experience, because Carnival invites passengers to this port of call as part of the cruise, and because of the close proximity of the island and these activities to the cruise ship, the Plaintiff's claims are governed by the general maritime law.

45.     Carnival encourages its passengers to roam around the island, spend their money at the island's shops, and to pay for and participate in excursions and activities on the island. Carnival also encourages its passengers to utilize the private beach at Half Moon Cay. In order for passengers to access Half Moon Cay itself, Carnival knows that its passengers must disembark off of tender vessels and walk down a ramp which leads passengers past a foot wash station, which protrudes into the walkway.  Video posted on the internet by other cruise passengers confirms that the subject foot wash and its barriers protruding into the walkway had been present for years prior to Norma Simpson's incident. In fact, one video posted by "Cruise Centric" in 2015 shows the same foot wash barriers present with Carnival crewmembers in the vicinity of the subject foot wash  Thus, Carnival had years to discover, remedy, and correct the dangerous change in walkway level presented by the foot wash barriers.

46.     **CARNIVAL CONTROLS**.  Carnival has direct, indirect, and/or de facto control of the operation, maintenance, and safety of the cruise passenger facility on Half Moon Cay. Half Moon Cay is owned by HAL Properties Limited. But HAL Properties Limited is a wholly owned subsidiary of another wholly owned Carnival corporation subsidiary including but not limited to Holland America Line N.V. d/b/a Holland America Line N.V. LLC; HAL Antillen N.V.; Holland America Line Inc.; and/or Holland America Line-USA, Inc. d/b/a Holland America Lines. HAL Properties Limited and the corporations which own or control HAL Properties Limited shall hereinafter collectively be referred to as ("HAL"). The Defendant Carnival, through these relationships, controls

16

or has the ability to control the operations and the activities of HAL and therefore the operation, maintenance, and/or safety of the cruise passenger facilities on Half Moon Cay.

47. **EVEN IF NO CONTROL, CARNIVAL INVITES ITS PASSENGERS TO HALF MOON CAY ON A REGULAR BASIS AND KNOWS OR SHOULD KNOW OF DANGEROUS CONDITIONS LIKE TRIP HAZARDS ON THE ISLAND:** Even if Carnival has no control over the maintenance and safety of the premises of Half Moon Cay where Carnival delivers and directs its passengers on a regular basis, Carnival either knows about the dangerous conditions on this island or should know about the dangerous conditions.  That includes trip hazards which exist for long enough that in the exercise of reasonable care Carnival should have corrected them.  This duty also extends to the trip hazard presented by the foot wash barriers described above which exist right off the tender entry and exit foot path.

48. Carnival brings approximately 350,000 passengers to Half Moon Cay each year. Carnival also brings at least hundreds if not thousands of Carnival crewmembers to the island via tender boats.  Thus, Carnival knows or reasonably should know about the foreseeable paths of passenger foot traffic as Carnival's guests exit tender boats and make their way onto Half Moon Cay.  Likewise, Carnival knew or at least should have known about the raised barriers of the foot wash which protruded into the walkway coming and going from the tender boats. Carnival knew this because its crewmembers who are employees of the Defendant walked past the raised barriers where Plaintiff tripped on the date of the incident both before and after Plaintiff tripped.  And the foot wash barriers were present for years, since at least 2015, given video taken and posted to the internet by other cruise passengers. Thus, Carnival had years to discover and remedy the dangerous trip hazard.

49. **CARNIVAL'S NOTICE**: Carnival knows to inspect for trip hazards on Half Moon Cay because Carnival is aware of passengers before the Plaintiff Norma Simpson who have tripped and fallen at dangerous changes in elevation while visiting the island.   Thus, Carnival knew long before Norma Simpson's incident that sudden changes in elevation in pedestrian walkways create trip hazards that can result in passenger injuries.  Carnival knew it needed to inspect for uneven surfaces and abrupt changes in level on Half Moon Cay.

50. One example of Carnival's awareness of trip hazards involves the case of Ralph Moseley, a Carnival Cruise passenger who tripped and fell on January 30, 2019 after Carnival invited Mr. Moseley and his wife to visit Half Moon Cay.  On January 30, 2019, Moseley walked toward a building to rent a sunshade. Moseley suddenly and unexpectedly tripped and fell over an uneven, raised wooden plank and suffered serious injuries.  Based upon information and belief, Carnival treated Moseley medically on-board the ship and created an accident report of this incident.   The trip hazard which Moseley encountered was a condition creating a sudden change in level in a walkway.  Similarly, Norma Simpson's trip and fall resulted from a sudden change in level at or protruding into the walkway on the Half Moon Cay where Carnival invited its passengers on January 8, 2020.

51. Carnival also knows that sudden changes in elevation of a walking surface are violations of industry safety standards including standards which apply to Carnival.  Carnival is at a very minimum aware of minimum safety standards for walkways from prior litigation cases, including Howard Bunch v. Carnival, Case No. 18-cv-21867.     In 2019 (prior to Simpson's incident), Carnival learned through the Howard-Bunch litigation that abrupt changes in the level of a walking surface should be no more ½ of an inch. See, ASTM 1637. Sudden changes in the level of a walking surface greater than ½ of an inch are dangerous trip hazards and would require

the installation of a ramp or a stair (or would require some other means to make the walking surface flush). The abrupt change in level presented by the protruding foot wash barriers substantially exceeded ½ of an inch and were thus dangerous and capable of causing passengers, like Norma Simpson, to trip and fall.   Thus, it should have been known to Carnival that the abrupt change in level created by the foot wash barriers was a dangerous trip hazard before January 8, 2020.  This is especially the case here where Carnival regularly visited the island and brought cruise passengers as well as its employee crewmembers to shore.

52. In the alternative, Carnival created the dangerous condition and accordingly notice is not a required element of proof. Carnival singularly and/or as a venture with HAL created the foot wash structure on the island utilized by its passengers.

53. Further, Carnival participated in and had control over the design and construction of the facilities on the island including the subject walkway and foot wash existing near where passengers including Plaintiff Norma Simpson exited the tender boats onto Half Moon Cay on January 8, 2020. Carnival has a new build department with architectural and design professionals on staff and personnel dedicated to designing and constructing these features or dedicated to supervising the people or companies which the cruise line retains to design and construct these facilities. Carnival in the pre-construction phase through these and other personnel directly participates in the design process of the island facilities and finishes and is shown and given access to plans of the exterior areas and finishes including where this incident occurred. Carnival participates in the design process itself and has the right to inspect and the right to reject aspects of the pre-construction designs. Carnival posts representatives at the island during the construction process called site team members. During that process and afterwards, Carnival has the right to

inspect and the right to reject aspects of the as-built design and construction of the exterior finishes including the subject foot wash.

54**. CARNIVAL VOLUNTARILY UNDERTAKES TO INSPECT AND CORRECT.**

Carnival also has a department and/or personnel which oversee the venues to which the Carnival ships take its passengers. Therefore, Carnival voluntarily undertakes to inspect and to correct dangerous conditions on the properties to which it delivers its passengers or to which it directs its passengers, including Half Moon Cay.

55. **THE SUBJECT FOOTWASH PRESENTS A DANGEROUS TRIP HAZARD**.

On Half Moon Cay exiting the tender boats exists a sudden, raised change in walkway elevation, in other words a trip hazard.  The condition presents a trip hazard because of the sudden and unexpected way in which foot wash barriers project above an otherwise flush flat walking surface in the area and protrude into a foreseeable pedestrian walkway.  The change in elevation at the foot wash barriers is significantly greater than ½ an inch and violates industry safety standards for safe walkways.   When passengers exit the tenders and onto the walkway into Half Moon Cay, passengers like Norma Simpson who are behind others cannot get a clear view of the raised foot-wash barriers.  Thus, the raised trip hazard in this case was not open and obvious to Norma Simpson under the pertinent circumstances.  The foot wash barrier constituted a disguised, trip hazard.

56. Based upon information and belief and due to the high volume of passengers visiting the island, Carnival also had notice of the subject dangerous condition by and through prior incidents which resulted in accident reports, by and through receiving guest complaints about the subject walkway and trip hazard, and/or by and through discussion of the subject hazard and similar trip hazards in shipboard and shoreside safety committee meetings.

20

57. Carnival had actual or constructive knowledge of the danger of the foot wash trip hazard. Carnival knew or should have known of the trip hazard in a few different ways. First, Carnival sends over hundreds of its crewmembers to man operations at Half Moon Cay. Carnival has done this for at least 140 cruises a year for at least 5 years prior to this incident. All of the crew had full access to the island including the subject foot wash hazard. Because so many crewmembers were on the island and had access to the walkway leading off of the tender and into the rest of Half Moon Cay for so long, there certainly is a permissible inference that the Carnival crewmembers knew of the condition of foot wash trip hazard.

58. **THIS INCIDENT AND THESE INJURIES**. On January 8, 2020, Norma Simpson, a passenger aboard the Carnival *Victory*, was transported to Half Moon Cay on the Carnival tender. The Carnival tender was manned by Carnival employees wearing Carnival name tags. When the tender carrying Plaintiff Simpson docked, Plaintiff and the other passengers were permitted to exit the tender down a ramp and then onto a walkway which unbeknownst to Plaintiff Simpson featured the foot wash trip hazard. Without being provided adequate and/or sufficient warning from Carnival and/or HAL about the subject foot wash in the foreseeable walkway of passengers exiting the tender, Plaintiff Simpson made her way off of the tender vessel. As Plaintiff walked off the vessel and into the walkway, other passengers were in a rush and jostling for position to get into Half Moon Cay. Carnival and/or HAL did not take any reasonable action to control and/or direct this crowd. The crowd of other passengers both in front of and behind the Plaintiff made it so Plaintiff Simpson could not make out hazards in the walkway. Suddenly and without warning to her, Plaintiff's foot got caught and Plaintiff tripped and fell. The hidden foot wash barriers caused the Plaintiff to trip and fall and suffer serious injuries as she exited the tender area on January 8, 2020.

59. Due to Carnival's and/or HAL's negligence, the Plaintiff's suffered injuries including but not limited to a traumatic brain injury and a fractured right proximal humerus.  These injuries have on-going and permanent effects. After the incident, Carnival examined and treated Plaintiff Simpson onboard the Carnival Victory and created an incident report.  Upon returning home, the Plaintiff underwent an open reduction internal fixation surgery. These are extremely painful injuries and have caused, and will continue to cause the Plaintiff severe disability and permanent impairment of function.

<u>**COUNT I**</u>
<u>**CARNIVAL'S FAILURE TO WARN ADEQUATELY**</u>

60.  The Plaintiff, hereby adopts and re-alleges each and every allegation in paragraphs 1 through 59, above.

61. This is an action for negligent failure to warn against Defendant Carnival.

62. <u>**DUTIES OWED BY THE DEFENDANT**</u>.  The Defendant owes a "duty to exercise reasonable care for the safety of its passengers" including the Plaintiff herein. See, *Hall vs. Royal Caribbean Cruises, Limited*, 888 So. 2d 654 (Fla. 3d DCA 2004), 2004 A.M.C. 1913; citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S. Ct. 406, 3 L. Ed. 2d 550 (1959); *The Moses Taylor*, 4 Wall. 411, 71 U.S. 411, 18 L. Ed. 397 (1866); *Carlisle v. Ulysses Line Ltd*., 475 So. 2d 248 (Fla. 3d DCA 1985).  The Defendant also owed a "duty to exercise reasonable care under the circumstances". See, *Harnesk vs. Carnival Cruise Lines, Inc*, 1992 AMC 1472, 1991 WL 329584 (S. D. Fla. 1991). The Defendant's "duty is to warn of dangers known to the carrier in places where the passenger is invited to, or may reasonably be expected to visit."  See, *Carlisle vs. Ulysses Line Limited*, *S.A*., 475 So. 2d 248 (Fla. 3d DCA 1985). Vierling v. Celebrity Cruises, 339 F.3d 1309, 1319-20 (11th Cir. 2003)("Courts sitting in admiralty have long recognized an

obligation on the part of a carrier to furnish its passengers with a reasonably safe means of boarding and leaving the vessel, that this obligation is nondelegable, and that even the 'slightest negligence' renders a carrier liable).  The cruise line has a duty to provide safe ingress and egress to and from the ship.  *Tittle v. Aldacosta*, 544 F.2d 752 (5th Cir. 1977); *Bellocchio v. Italia Flotte* 84 F.2d 975 (2d Cir. 1936); *Samuelov v. Carnival,* 870 So.2d 853 (Fla. 3DCA 2004); and *Chan v. Society Expeditions*, 123 F.3d 1287 (9th Cir. 1997).

63. The Defendant owed a duty to the Plaintiff because, as more fully described above, Carnival brings its passengers to Half Moon Cay. Regardless of ownership and the agreement between Carnival and HAL Properties Ltd., Carnival brings its passengers to Half Moon Cay on an ongoing repetitive basis.  Carnival transports its passengers to Half Moon Cay as part of the cruise experience it creates for the benefit of its passengers as well to generate an additional, significant profit from its passengers.  Carnival is able to generate additional profit from its passengers by selling shore activities, as well as the food, drink, and souvenirs Carnival transports from its ships to the island.

64. **NOTICE:** Carnival crewmembers for years have walked past and/or been in the vicinity of the trip hazard as they exit Carnival tender boats to work on the island.  Video evidence dating to 2015 shows that foot wash barriers have been present for at least the last five years. These crewmembers have known or at least should know and seen that the foot wash barriers created an uneven walking surface high enough to catch someone's foot walking past.   Carnival and its crewmembers also knew, should have known, and/or seen that the foot wash barriers protruded into the walkway and/or the foreseeable path of cruise passengers exiting the tender boats at Half Moon Cay.   Carnival also knows from past litigation experience before January 8, 2020 that changes in walkway level of greater than ½ of an inch presents a dangerous trip hazard.  The subject foot wash

barriers in this case greatly exceeded ½ of inch in height and should have been known to Carnival as dangerous trip hazards.  Moreover, Carnival knew or should have known about a number of prior trip and fall incidents on Half Moon Cay before January 8, 2020 which were caused by abrupt changes in walkway level similar to Norma Simpson's incident.  One such instance cited above involved cruise passenger Ralph Moseley who tripped and fell on a walkway featuring an abrupt change in level in January 2019.

65. The Defendant created this dangerous condition and allowed the dangerous condition to exist thereby causing an incident on the date referenced above in which the Plaintiff was severely injured.

66. The Defendant either (a) created the dangerous condition, through its agents or employees; (b) had actual knowledge of the dangerous condition; and/or (c) had constructive knowledge of the dangerous condition.

67. The Defendant had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the size and/or nature of the dangerous condition; (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity; and/or (d) the fact that the Defendant regularly schedules its ships to stop at Half Moon Cay, regularly directs and promotes that its passengers visit Half Moon Cay, and regularly provides the transportation for its cruise passengers from its ships to Half Moon Cay. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care the Defendant should have known about it.

68. In the alternative, notice to the Defendant is not required because the Defendant (a) engaged in and was guilty of negligent maintenance; and/or (b) engaged in and was guilty of negligent methods of operations.

69. The negligent condition was created by the Defendant; and was known to the Defendant; and had existed for a sufficient length of time so that Defendant should have known of it; and was a continuous or repetitive problem thus giving notice to the Defendant.

70. The Defendant Carnival breached its duty of care and was negligent by its actions, inactions, and conduct by failing to properly to warn Plaintiff of the trip hazard with proper and well placed signs, by failing to provide verbal warnings of the trip hazard coming off of the tender boat; by failing to warn guests not to rush and crowd when exiting the tender boat onto Half Moon Cay, by failing to use warning tape to block or cordon off the area of the dangerous trip hazard so it would not be protruding into the walkway; by failing to warn passengers about a trip hazard which exceeded minimum allowable standards for changes in a walkway level; and by failing to otherwise warn about the raised foot wash barriers.

71. But for Defendant's failures to warn Plaintiff, Plaintiff would have been able to avoid and/or safely navigate around the subject hazard and would have avoided injury.  Thus, the Defendant's negligence proximately caused the permanent injuries and damages to the Plaintiff in the past and in the future.  Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity

for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiff demands judgment against CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE for all damages to which she is entitled under the General Maritime Law and otherwise including but not limited to economic damages suffered in the past and in the future on a permanent basis by the Plaintiff including but not limited to expenses for medical and psychological care and treatment, household and other expenses, loss of income, and loss of the ability and capacity to earn income in the future; non-economic damages including but not limited to bodily injury, pain, suffering, mental anguish, loss of the enjoyment of life, physical impairment, disability, inconvenience, scarring, and disfigurement; punitive damages, all court costs; all interest which accrues from the date of the incident on all economic and non-economic damages under the General Maritime Law; and any and all other damages which the Court deems just and proper.

### COUNT II – CARNIVAL'S FAILURE TO MAINTAIN/CORRECT

72. The Plaintiff, hereby adopts and re-alleges each and every allegation in paragraphs 1 through 57, above.

73. This is a negligence action against Carnival for its failure to act reasonably to maintain the walkway and correct the dangers which Carnival knew or should have known about.

74. **DUTIES OWED BY THE DEFENDANT**. The Defendant owes a "duty to exercise reasonable care for the safety of its passengers" including the Plaintiff herein. See, Hall vs. Royal Caribbean Cruises, Limited, 888 So. 2d 654 (Fla. 3d DCA 2004), 2004 A.M.C. 1913; citing Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S. Ct. 406, 3 L. Ed. 2d 550 (1959); The Moses Taylor, 4 Wall. 411, 71 U.S. 411, 18 L. Ed. 397 (1866); Carlisle v.

Ulysses Line Ltd., 475 So. 2d 248 (Fla. 3d DCA 1985).  The Defendant also owed a "duty to exercise reasonable care under the circumstances". See, Harnesk vs. Carnival Cruise Lines, Inc, 1992 AMC 1472, 1991 WL 329584 (S. D. Fla. 1991). The cruise line has a duty to provide safe ingress and egress to and from the ship.  Tittle v. Aldacosta, 544 F.2d 752 (5th Cir. 1977); Bellocchio v. Italia Flotte 84 F.2d 975 (2d Cir. 1936); Samuelov v. Carnival, 870 So.2d 853 (Fla. 3DCA 2004); and Chan v. Society Expeditions, 123 F.3d 1287 (9th Cir. 1997).

75.  The Defendant Carnival owed a duty to the Plaintiff because, as more fully described above, Carnival invites its passengers to Half Moon Cay and controls the subject island. Regardless of ownership and the agreement between Carnival and HAL Properties Ltd., Carnival brings its passengers to Half Moon Cay on an ongoing repetitive basis.  Carnival transports its passengers to Half Moon Cay as part of the cruise experience it creates for the benefit of its passengers as well to generate an additional, significant profit from its passengers.  Carnival is able to generate additional profit from its passengers by selling shore activities, as well as the food, drink, and souvenirs Carnival transports from its ships to the island.

76.  **NOTICE:** Carnival crewmembers for years have walked past and/or been in the vicinity of the trip hazard as they exit Carnival tender boats to work on the island.  Video evidence dating to 2015 shows that foot wash barriers have been present for at least the last five years. These crewmembers have known or at least should know and seen that the foot wash barriers created an uneven walking surface high enough to catch someone's foot walking past.   Carnival and its crewmembers also knew, should have known, and/or seen that the foot wash barriers protruded into the walkway and/or the foreseeable path of cruise passengers exiting the tender boats at Half Moon Cay.   Carnival also knows from past litigation experience before January 8, 2020 that changes in walkway level of greater than ½ of an inch presents a dangerous trip hazard.  The subject foot wash

barriers in this case greatly exceeded ½ of inch in height and should have been known to Carnival as dangerous trip hazards.  Moreover, Carnival knew or should have known about a number of prior trip and fall incidents on Half Moon Cay before January 8, 2020 which were caused by abrupt changes in walkway level similar to Norma Simpson's incident.  One such instance cited above involved cruise passenger Ralph Moseley who tripped and fell on a walkway featuring an abrupt change in level in January 2019.

77. The Defendant created this dangerous condition and allowed the dangerous condition to exist thereby causing an incident on the date referenced above in which the Plaintiff was severely injured.

78. The Defendant either (a) created the dangerous condition, through its agents or employees; (b) had actual knowledge of the dangerous condition; and/or (c) had constructive knowledge of the dangerous condition.

79. The Defendant had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the size and/or nature of the dangerous condition; (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity; and/or (d) the fact that the Defendant regularly schedules its ships to stop at Half Moon Cay, regularly directs and promotes that its passengers visit Half Moon Cay, and regularly provides the transportation for its cruise passengers from its ships to Half Moon Cay. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care the Defendant should have known about it.

80. In the alternative, notice to the Defendant is not required because the Defendant (a) engaged in and was guilty of negligent maintenance; and/or (b) engaged in and was guilty of negligent methods of operations.

81. The negligent condition was created by the Defendant; and was known to the Defendant; and had existed for a sufficient length of time so that Defendant should have known of it; and was a continuous or repetitive problem thus giving notice to the Defendant.

82. The Defendant breached its duty of care and was negligent by its actions, inactions, and conduct by failing to provide Plaintiff and other passengers with a safe walking surface exiting the tender vessels, by failing to correct and level off the walkway exiting the tender vessel, by failing to manage and control the crowd exiting the tender vessel so that Plaintiff could safely navigate the walking surface, by failing to use ropes or cordons to block off the dangerous trip hazard and direct the passenger foot traffic away from the subject foot wash, by creating and/or approving of the construction of a uneven, trip hazard in a foreseeable walkway, by failing to safely maintain the walkway over several years by not removing the walkway obstruction and/or re-positioning it; by failing to organize and control the crowds exiting the tender vessels; by failing to comply with applicable standards, statutes, and/or regulations the violation of which is negligence per se and/or evidence of negligence; by failing to comply with applicable industry standards, statutes, and/or regulations which invokes the Pennsylvania Rule and shifts the burden of proof to the Defendant in the proof of negligence or proof of the absence of negligence, and by otherwise failing to make safe the subject walkway.

83. But for Carnival's breaches of the duty of care, Plaintiff would have been able to safely navigate the walkway exiting the tender boat.  Had Carnival taken reasonable action to correct and remedy the trip hazard and/or controlled the crowd and directed passengers along a

29

safer route, Plaintiff's incident and her injuries would have been avoided. Carnival's negligence thus caused Plaintiff's injuries and damages.

84. The Defendant's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future.  Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiff demands judgment  against  CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE for all damages to which she is entitled under the General Maritime Law and otherwise including but not limited to economic damages suffered in the past and in the future on a permanent basis by the Plaintiff including but not limited to expenses for medical and psychological care and treatment, household and other expenses, loss of income, and loss of the ability and capacity to earn income in the future; non-economic damages including but not limited to bodily injury, pain, suffering, mental anguish, loss of the enjoyment of life, physical impairment, disability, inconvenience, scarring, and disfigurement; punitive damages, all  court costs; all interest which accrues from the date of the incident on all economic and non-economic damages under the General Maritime Law; and any and all other damages which the Court deems just and proper.

## COUNT III- DEFENDANT CARNIVAL'S VICARIOUS LIABILITY
## FOR HAL'S FAILURE TO WARN

85. The Plaintiff hereby adopts and re-alleges each and every allegation in paragraphs 1 through 59 above.

86. HAL served as Carnival's apparent agent, actual agent, and/or joint venture partner in connection with cruise voyages made to Half Moon Cay for many years prior to Norma Simpson's incident and up through January 8, 2020.   As the joint venture partner of Carnival and/or Carnival's actual agent or apparent agent, Carnival at all times material hereto, was vicariously liability for the negligence, conduct, and acts or omissions of HAL.

87.  HAL owed a duty of reasonable care under the circumstances to Plaintiff Norma Simpson and other Carnival cruise passengers to warn of hazards on Half Moon Cay like the subject trip hazard in this case.

88. **NOTICE:** HAL knew or should have known of the risk passengers tripping and falling while exiting the tender vessel onto Half Moon Cay as happened in this case on January 8, 2020. HAL's knowledge stems from its presence on Half Moon Cay for years prior to January 8, 2020. HAL's knowledge also stems from its partnership and agency relationship with Carnival. Given its joint venture relationship with Carnival, HAL enjoyed at least a joint right of control over Half Moon Cay and was thus responsible for inspecting the island for hazards like the foot wash barriers involved in this case.  Thus, HAL knew or at least should have known of the subject trip hazard and taken reasonable action to warn and/or remedy the condition. In fact, video evidence dating to 2015 shows that the subject foot wash barriers have been present for at least the last five years in the location where Plaintiff Simpson tripped and fell.  This would have provided HAL ample time to discover and take action to warn or remedy the danger.

89. HAL also reasonably knew or should have known about prior trip incidents, like the Moseley incident alleged above. That is because HAL stations a manager full-time on the island and collaborates and communicates with Carnival on a frequent basis as Carnival ships come and go from the island.   Under the circumstances, HAL knew or reasonable should have known about the danger of maintaining abrupt changes in walkway level on Half Moon Cay and that such conditions needed to be warned about and/or corrected.

90. HAL created this dangerous condition and allowed the dangerous condition to exist thereby causing an incident on the date referenced above in which the Plaintiff was severely injured.

91. HAL either (a) created the dangerous condition, through its agents or employees; (b) had actual knowledge of the dangerous condition; and/or (c) had constructive knowledge of the dangerous condition.

92. HAL had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the size and/or nature of the dangerous condition; (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity; and/or (d) the fact that HAL regularly accepts ships at Half Moon Cay and regularly assists in providing the transportation for cruise passengers visiting Half Moon Cay. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care HAL should have known about it.

93. In the alternative, notice to HAL is not required because HAL (a) engaged in and was guilty of negligent maintenance; and/or (b) engaged in and was guilty of negligent methods of operations.

94. The negligent condition was created by the HAL; and was known to HAL; and had existed for a sufficient length of time so that HAL should have known of it; and was a continuous or repetitive problem thus giving notice to HAL

95.  HAL breached its duties and was negligent by its actions, inactions, and conduct by failing to properly to warn Plaintiff of the trip hazard with proper and well placed signs, by failing to provide verbal warnings of the trip hazard coming off of the tender boat; by failing to warn guests not to rush and crowd when exiting the tender boat onto Half Moon Cay, by failing to use warning tape to block or cordon off the area of the dangerous trip hazard so it would not be protruding into the walkway; by failing to warn passengers about a trip hazard which exceeded minimum allowable standards for changes in a walkway level; and by failing to otherwise warn about the raised foot wash barriers.

96. Carnival is liable and/or responsible for the negligence of HAL because HAL acted and acts as Carnival's actual agent or apparent agent or joint venturer of the Defendant cruise line as alleged above.

97. Based on the allegations cited above regarding Carnival and HAL's intent to enter into a joint venture, common purpose, joint control/right of control, proprietary interest, system of sharing profits and losses, Carnival is responsible for the negligence of HAL by virtue of the joint venture.

98. But for HAL's breaches of the duty of care, Plaintiff would have been able to avoid the dangerous foot wash barrier and avoided her trip and resulting injuries.

99. The negligence of HAL proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future. Those injuries

and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiff demands judgment against CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE for all damages to which she is entitled under the General Maritime Law and otherwise including but not limited to economic damages suffered in the past and in the future on a permanent basis by the Plaintiff including but not limited to expenses for medical and psychological care and treatment, household and other expenses, loss of income, and loss of the ability and capacity to earn income in the future; non-economic damages including but not limited to bodily injury, pain, suffering, mental anguish, loss of the enjoyment of life, physical impairment, disability, inconvenience, scarring, and disfigurement; punitive damages, all court costs; all interest which accrues from the date of the incident on all economic and non-economic damages under the General Maritime Law; and any and all other damages which the Court deems just and proper.

## COUNT IV – CARNIVAL'S VICARIOUS LIABILITY FOR HAL'S FAILURE TO MAINTAIN/CORRECT THE HAZARD

100. The Plaintiff hereby adopts and re-alleges each and every allegation in paragraphs 1 through 59 above.

101. HAL served as Carnival's apparent agent, actual agent, and/or joint venture partner in connection with cruise voyages made to Half Moon Cay for many years prior to Norma Simpson's incident and up through January 8, 2020. As the joint venture partner of Carnival and/or Carnival's

actual agent or apparent agent, Carnival at all times material hereto, was vicariously liability for the negligence, conduct, and acts or omissions of HAL.

102.   HAL owed a duty of reasonable care under the circumstances to Plaintiff Norma Simpson and other Carnival cruise passengers to maintain its premises in a reasonable safe condition including keeping its walkways free of dangerous trip hazards and controlling and managing the tender disembarkation process.

103. **NOTICE:** HAL knew or should have known of the risk passengers tripping and falling while exiting the tender vessel onto Half Moon Cay as happened in this case on January 8, 2020. HAL's knowledge stems from its presence on Half Moon Cay for years prior to January 8, 2020. HAL's knowledge also stems from its partnership and agency relationship with Carnival. Given its joint venture relationship with Carnival, HAL enjoyed at least a joint right of control over Half Moon Cay and was thus responsible for inspecting the island for hazards like the foot wash barriers involved in this case.  Thus, HAL knew or at least should have known of the subject trip hazard and taken reasonable action to warn and/or remedy the condition. In fact, video evidence dating to 2015 shows that the subject foot wash barriers have been present for at least the last five years in the location where Plaintiff Simpson tripped and fell.  This would have provided HAL ample time to discover and take corrective action to remedy the hazard and/or provide clear warnings.

104. HAL also reasonably knew or should have known about prior trip incidents, like the Moseley incident alleged above. That is because HAL stations a manager full-time on the island and collaborates and communications with Carnival on a frequent basis as Carnival ships come and go from the island.   Under all the pertinent circumstances, HAL knew or reasonable should have known about the danger of maintaining abrupt changes in walkway level on Half Moon Cay and that such conditions needed to be warned about and/or corrected.

105. HAL created this dangerous condition and allowed the dangerous condition to exist thereby causing an incident on the date referenced above in which the Plaintiff was severely injured.

106. HAL either (a) created the dangerous condition, through its agents or employees; (b) had actual knowledge of the dangerous condition; and/or (c) had constructive knowledge of the dangerous condition.

107. HAL had constructive knowledge of the dangerous condition by, inter alia, (a) the length of time the dangerous condition existed; (b) the size and/or nature of the dangerous condition; (c) the fact that the dangerous condition, a similar dangerous condition, or the cause of the dangerous condition was repetitive, continuous, ongoing, recurring, or occurring with some regularity; and/or (d) the fact that HAL regularly receives passengers from Carnival ships at Half Moon Cay and regularly assists with providing the transportation for cruise passengers to get from the ships to Half Moon Cay. Thus, the dangerous condition was reasonably foreseeable and in the exercise of reasonable care HAL should have known about it.

108. In the alternative, notice to the HAL is not required because the HAL (a) engaged in and was guilty of negligent maintenance; and/or (b) engaged in and was guilty of negligent methods of operations.

109. The negligent condition was created by HAL; and was known to HAL; and had existed for a sufficient length of time so that HAL should have known of it; and was a continuous or repetitive problem thus giving notice to HAL.

110. HAL breached its duties and was negligent by its actions, inactions, and conduct by failing to provide Plaintiff and other passengers with a safe walking surface exiting the tender vessels, by failing to correct and level off the walkway exiting the tender vessel, by failing to manage and control the crowd exiting the tender vessel so that Plaintiff could safely navigate the

walking surface, by failing to use ropes or cordons to block off the dangerous trip hazard and direct the passenger foot traffic away from the subject foot wash, by creating and/or approving of the construction of a uneven, trip hazard in a foreseeable walkway, by failing to safely maintain the walkway over several years by not removing the walkway obstruction and/or re-positioning it; by failing to comply with applicable standards, statutes, and/or regulations the violation of which is negligence per se and/or evidence of negligence; by failing to organize and control the crowds exiting the tender vessels; by failing to comply with applicable industry standards, statutes, and/or regulations which invokes the Pennsylvania Rule and shifts the burden of proof to the Defendant in the proof of negligence or proof of the absence of negligence, and by otherwise failing to make safe the subject walkway area.

111. Carnival is liable and/or responsible for the negligence of HAL because HAL acted and acts as Carnival's actual agent or apparent agent or joint venturer of the Defendant cruise line as alleged above.

112. Based on the allegations cited above regarding Carnival and HAL's intent to enter into a joint venture, the common purpose, the joint control/right of control, the proprietary interest, and the system of sharing profits and losses, Carnival is responsible for the negligence of HAL by virtue of the joint venture.

113. But for HAL's breaches of the duty of care, Plaintiff would have been able to avoid the dangerous foot wash barrier and avoided her trip and resulting injuries.  Reasonable action from HAL to control the disembarkation crowd and/or make safe the abrupt change in the walkway level would have allowed Plaintiff to avoid her trip and resulting injuries.

114. The negligence of HAL proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to

economic damages including medical, psychological, and other related expenses in the past and in the future; and household and other related expenses in the past and in the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiff demands judgment against CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE for all damages to which she is entitled under the General Maritime Law and otherwise including but not limited to economic damages suffered in the past and in the future on a permanent basis by the Plaintiff including but not limited to expenses for medical and psychological care and treatment, household and other expenses, loss of income, and loss of the ability and capacity to earn income in the future; non-economic damages including but not limited to bodily injury, pain, suffering, mental anguish, loss of the enjoyment of life, physical impairment, disability, inconvenience, scarring, and disfigurement; punitive damages, all court costs; all interest which accrues from the date of the incident on all economic and non-economic damages under the General Maritime Law; and any and all other damages which the Court deems just and proper.

*/s/ John H. Hickey*
John H. Hickey, Esq. (FBN 305081)
hickey@hickeylawfirm.com
federalcourtfilings@hickeylawfirm.com
Christopher B. Smith, Esq. (0121925)
csmith@hickeylawfirm.com
**Hickey Law Firm, P.A.**
1401 Brickell Avenue, Suite 510
Miami, FL 33131-3504
Tel. (305) 371-8000
Fax (305) 371-3542
*Attorneys for Plaintiff*